**Dewey Michael WILLIAMS Plaintiff**

v.

**CITY OF LONDON, et al Defendants**

**No. CIV.A.2001–165–WOB.**

United States District Court,
E.D. Kentucky,
London Division.

March 19, 2003.

Christopher D. Miller, William C. Rambicure, Rambicure, Miller & Kuebler, PSC, Lexington, KY, for Plaintiff.

Douglas L. McSwain, Jennifer Christine Philpot, Sturgill, Turner, Baker & Maloney, Lexington, KY, LaDonna Lynn Koebel and Robert L. Roark, Walter, Roark, Gay & Todd, Lexington, KY, for Defendant.

## *OPINION AND ORDER*

BERTELSMAN, District Judge.

On January 13, 2003, an oral argument on the parties' motions for summary judgment was held via a telephonic conference

call. The plaintiff was represented by Christopher D. Miller and William Rambicure. The defendants London Utility Commission and the individual commissioners were represented by Douglas L. McSwain and Charles Cole; and the defendants City of London and Mayor Ken Smith were represented by Robert L. Roark. The proceedings were recorded by official court reporter Joan Averdick.

At the conclusion of the hearing, the court found that the plaintiff was an employee of the City of London for the purposes of the motions before the court and accordingly ruled in favor of the defendants as to all claims surrounding the employment contract. However, the parties presented arguments regarding the plaintiff's application for disability benefits, which were not fully developed in their respective briefs. Therefore, the court withheld ruling on the plaintiff's claims of discrimination based on disability until further briefing. Also, the court indicated that it would issue an explanation on its reasons for concluding that the plaintiff was a City employee, as opposed to an employee of the Commission, once the briefing on the plaintiff's ADA claims was finalized. The parties have supplemented their briefs on the plaintiff's ADA claims. The court has thoroughly reviewed all the pending matters before it and hereby finds for the defendants on all claims.

### Background

Plaintiff Dewey Michael Williams was employed by the Utility Commission of the City of London, Kentucky, as superintendent in late 1992. Later, in March of 1998, the Commission entered into a written employment agreement with Williams. The deposition testimony bears out the defendants' contention that when this contract was entered into, both sides knew it may not have been valid because the Commission was not certain it had the authority to enter into the contract. The agreement was signed by Commissioners Michael Hamm, as Chairman of the Board, Bill Azbill, Stephen Chesnut, Bobby Massie, and Frank Cornett. No one on behalf of the City of London signed the agreement.

Williams alleges this employment agreement was entered into pursuant to the Commission's authority contained in Ordinance 344, which was passed in 1948. Ordinance 344 provided, among other things, that the Commission was to have charge of the general supervision and control of the operation and maintenance of the water and sewer facilities of the City of London. Pursuant to Ordinance 344, the Commission was required to employ a project superintendent who was removable only for cause.

In November of 2000, the City of London passed Ordinance 981, which repealed Ordinance 344 and re-established and recreated the Commission. Also included in Ordinance 981 was that the Mayor was to make all decisions relating to hiring, lay-offs, terminations, and other similar decisions. (Doc. # 17 ex. A. ¶ 5).

However, section nine of Ordinance 981 reads as follows:

> The Commission shall be bound under the terms of any previous contracts and/or agreements made and entered into by or on behalf of the Commission that exist at the time of the enactment of this Ordinance, that were entered into while the Commission existed under the provisions of London City Ordinance No. 344 and the City of London shall remain bound on any previous contracts and/or agreements in which the City previously was obligated in any manner.

The following is a chronology of the significant events:

| DATE | EVENT |
|------|-------|
| 1891 | Section 162 of the Kentucky Constitution was adopted and stated that "[n]o county, city, town or other municipality shall ever be authorized or permitted to pay any claim created against it, under any agreement or contract made without express authority of law, and all such unauthorized agreements or contracts shall be null and void." |
| 1942 | Kentucky's legislature passed KY. REV. STAT. ANN. § 96.530, which was titled "Electric light, heat and power plants, operation—Personnel—Utility Commission—Powers—Appointments—Board—Compensation." This statute included the following subsection: "The utility commission, when so appointed, shall be a . . . public body politic and corporate, with perpetual succession; and said body may contract and be contracted with, sue and be sued, in and by its corporate name, and have and use a corporate seal. The utility commission shall provide rules for the management of the plant, and it shall fix the number, qualifications, pay, and terms of employment of all employees needed to operate the plant." **However, this statute specifically did not include water commissions.** |
| 1942 | Kentucky's legislature passed KY. REV. STAT. ANN. § 96.350, which was titled "City of second, third, fourth, fifth or sixth class may acquire and operate waterworks."[1] This statute did not include the provisions regarding employees like those in KY. REV. STAT. ANN. § 96.530. |
| May 1948 | The City of London passed Ordinance 344 creating the Utility Commission for water and sewers. This Ordinance gave the Commission the authority to employ a "project superintendent." Additionally, the Ordinance stated that the salary of the superintendent would be set by the Commission and paid for out of the revenues of the Water Commission. Also, the superintendent could only be removed by the Commission "for inefficiency, neglect of duty, misfeasance or malfeasance in office." Specifically, however, the power to enter into employment contracts was not given in this Ordinance. |
| 1980 | Kentucky's legislature passed the Home Rule Statutes. Included in these statutes was KY. REV. STAT. ANN. § 83A.020, which stated that "[t]he present organization structure of each city shall remain in force until changed under this chapter. All ordinances and resolutions presently in force in each city not in conflict with the provisions of KRS 83A.010 to 83A.170 shall remain in force until changed." KY. REV. STAT. ANN. § 83A.130(9) stated that "[t]he mayor shall be the appointing authority with power to appoint and remove all city employees, including police officers, except as tenure and terms of employment are protected by statute, ordinance or contract and except for employees of the council." (Emphasis added). |
| Late 1992 | Plaintiff Michael Williams was employed by the Water Commission. |
| March 1998 | The Water Commission entered into a written contract with Williams. This agreement stated that "the term of this Agreement shall begin on the 18 day of March 1998, and shall continue for three (3) years. This Agreement will automatically renew for an additional three (3) year period unless Employer or Employee gives ninety (90) days advance written notice of termination of the Agreement prior to the end of the original term." The contract also allowed |

---

1. London is a fourth class city.

| | |
|---|---|
| | the Water Commission to terminate Williams' contract for cause once notice is given. Williams testified that at the time this contract was entered into that the City Attorney informed him that the contract may not be valid. |
| December 2000 | The City of London passed Ordinance 981 which included that the "The London Utility Commission shall recommend to the Mayor of the City of London a person to employ as Superintendent of the Commission." This Ordinance also stated that "[i]n keeping with present Kentucky law, the Mayor shall make all decisions relating to employment decisions of hiring, lay-offs, terminations, and other similar decisions relating to employment." However, section nine of the Ordinance stated that "The Commission shall be bound under the terms of any previous contracts and/or agreements made and entered into by or on behalf of the Commission that exist at the time of the enactment of this Ordinance, that were entered into while the Commission existed under the provisions of London City Ordinance No. 344 and the City of London shall remain bound on any previous contracts and/or agreements in which the City previously was obligated in any manner." |
| February 27, 2001 | Mayor Smith terminated Williams' employment. |

The defendants maintain that Ordinance 981 was passed because Ordinance 344 unlawfully took power from the local municipality and vested it in another entity—the Utility Commission. According to the defendants, Ordinance 344 violated the "Home Rule" concept. The Kentucky Home Rule Statutes expressly allow local governments to exercise any powers necessary to operate as long as such powers do not conflict with the Constitution or state or federal laws. Prior to the passage of the Home Rule Statutes, municipalities only possessed powers specifically outlined by the Kentucky General Assembly. Therefore, cities and counties could exercise only powers expressly and implicitly granted by the Kentucky Constitution and/or by federal and state statutes. Ordinance 981, based on the Home Rule Statutes, gave the mayor of the City all hiring and firing authority over city employees.

In early 2001, Mayor Smith determined that he wanted to terminate Williams as superintendent. The alleged reasons for this decision included personal relations problems, such as Williams' inability to work with the public and get along with different organizations. Also, a former employee named Ken Wilson had accused Williams of illegal conduct involving the Commission, including misusing its facilities and employees and waiving fees for some citizens, among other allegations. Mayor Smith complained that after the passage of Ordinance 981 Williams began referring petty employment-related matters to him instead of handling them. The Mayor also believed that Williams had lied or misrepresented facts to him. However, in his deposition testimony, the Mayor could not specifically say about what Williams had lied.

On or around February 22, 2001, Williams was told by Commissioner Hamm to attend a meeting with Mayor Smith and the City Attorney, Larry Bryson, and that Williams was going to be fired at this meeting. Apparently Hamm and Williams were good friends. When Commissioner Hamm learned of the Mayor's plan to terminate Williams, Hamm attempted to negotiate a deal with the Mayor that the Mayor would not fire Williams if he agreed to resign and, in exchange for his resignation, the City would agree not to contest Williams' application for disability retirement.

Williams did meet with Mayor Smith and Bryson. It is undisputed that it was Williams who brought up the issue of his health at this meeting and that, based on his discussions with Hamm, asked if he could stay on until June 2001 so he could apply for disability benefits.

The Mayor agreed to these terms. However, after the meeting, Williams determined that he would not resign because he believed he had a valid employment contract, and he did not think that the Mayor could terminate him. Accordingly, he sent a letter to the Mayor stating his intentions of staying on as superintendent based on his contract. After receiving Williams' letter, the Mayor terminated him on February 27, 2001.

Williams claims that he was terminated on the basis of disability discrimination.[2] He has suffered from diabetes and a heart condition. He also brought claims pursuant to 42 U.S.C. § 1983, and state law claims for breach of contract, intentional interference with contractual rights, intentional infliction of emotional distress, and breach of the implied covenant of good faith and fair dealing.

This matter is now before the court on the defendants' motion for summary judgment[3] and Williams' motion for partial summary judgment against the Mayor and the City of London, as well as the parties' supplemental briefs on the disability claim.

### Analysis

1. *Williams was an employee of the City rather than the Commission.*

One of the primary issues that needs to be resolved is whether Williams was an employee of the City or the Commission. Williams argues his employer was the Commission. All the defendants argue that he was an employee of the City, as the Commission is a City agency.

■ There are several statutes and ordinances at issue in this matter. Ordinance 344, the original ordinance setting up the Commission, gave the Commission the right to employ a superintendent. Ordinance 344 stated that "[t]he superintendent shall be removable by the Commission for inefficiency, neglect of duty, misfeasance or malfeasance in office."

In 1980, Kentucky's legislature passed the Home Rule Statutes and specifically KY. REV. STAT. ANN. § 83A.130(9) (Michie 1985), which stated that "[t]he mayor shall be the appointing authority with power to appoint and remove all city employees, including police officers, except as tenure and terms of employment are protected by statute, ordinance or contract and except for employees of council." While this statutory section does include exceptions for ordinances and contracts, the contract the London Water Commission made with the plaintiff was void, since it was in contravention of this statute.

Furthermore, the defendants point this court to opinions which postdate the Home Rule Statutes by the Kentucky Attorney General addressing the issues of whether water and sewer departments are legally independent of the city and therefore separate corporate bodies. The Attorney General stated that

[t]he water and sewer system was required to be organized under KRS 96.350, which does not authorize the establishing of an independent agency ... The courts have construed KRS 96.350

---

2. In his complaint, Williams also alleged he was terminated for age discrimination as well. He was replaced by someone only six years younger and who likewise was in the protected class. He did not contest summary judgment on this claim.

3. The Commissioners and the Commission move separately from the Mayor and the City of London.

as authorizing the city to operate the utility through a commission, etc., by ordinance, *Keathley v. Town of Martin,* 246 S.W.2d 152 [1951], and to abolish such commission at will. *City of Elizabethtown v. Cralle,* 317 S.W.2d 184 (1958). Such a commission can only be an agency of the city under this statute. KY. OP. ATT'Y. GEN. 81–324, 1981 WL 142133 (1981).

In another opinion, the Attorney General wrote that "[w]hile the courts have authorized the creation of a municipal utility commission to operate water and sewer services, the board or commission created by the city is not a separate corporate body, independent of the city, but an agency of the city." KY. OP. ATT'Y. GEN. 91–113, 1991 WL 533873 (1991). While Attorney General opinions are not binding on this court, the Sixth Circuit has recognized that they may be helpful and informative on areas of state law. *ACME Roll Forming Co. v. Home Ins. Co.,* No. 00–1795, 2002 WL 446960 n. 2 (6th Cir. March 20, 2002). Also, Kentucky courts have held that they are highly persuasive. *See Palmer v. Driggers,* 60 S.W.3d 591, 596 (Ky.Ct.App. 2001); *York v. Commonwealth of Kentucky,* 815 S.W.2d 415 (Ky.Ct.App.1991).

After a thorough review of the law and facts of this matter, the court concludes that Williams was an employee of the City of London and that his employment contract was invalid because the Home Rule Statutes, and in particular KY. REV. STAT. ANN. § 83A.120, went into effect prior to the execution of the contract agreement. Because Williams was an employee of the City, only the Mayor had the authority to hire or fire him. Thus, his contract was void from its inception.

Pursuant to Kentucky's Constitution "[n]o county, city, town or other municipality shall ever be authorized or permitted to pay any claim created against it, under any agreement or contract made without express authority of law, and all such unauthorized agreements or contracts shall be null and void." KY. CONST. § 162 (1891).

■ Accordingly, all claims Williams makes in reference to the employment contract are hereby dismissed. This finding includes dismissal of Williams' claims under 42 U.S.C. § 1983. Because there was no employment contract, Williams was an employee at will. Therefore, he cannot establish a claim under 42 U.S.C. § 1983 as he did not have a property interest to protect. *See Bailey v. Floyd County Bd. of Educ.,* 106 F.3d 135, 141 (6th Cir.1997).

### 2. *Williams cannot prevail on his ADA claims.*[4]

■ The Americans with Disabilities Act, "ADA", prohibits discrimination against a "qualified individual with a disability." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In turn, the ADA defines "disability" as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

■ Williams has the burden of establishing that he is protected by the ADA.

---

**4.** A city employee may bring an ADA claim against the City. *See generally Crocker v. City of Cleveland,* Nos. 01–3705, 01–3732, 2002 WL 1378237 (6th Cir. June 24, 2002); *cf. MX Group, Inc. v. City of Covington,* 293 F.3d 326 (6th Cir.2002).

To state a claim under the ADA, Williams must establish that: " '1) he is an individual with a disability; 2) he is "otherwise qualified" to perform the job requirements, with or without reasonable accommodations; and 3) he was discharged solely by reason of his handicap.' " *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 598 (6th Cir.2002) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)).[5]

If Williams can establish a prima facie case, the burden then shifts to the defendants to articulate a legitimate, nondiscriminatory reason for the termination. The burden then shifts back to Williams to demonstrate that the defendants' stated reasons are a pretext for discrimination. *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 (6th Cir.) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)), *cert. denied*, 531 U.S. 992, 121 S.Ct. 482, 148 L.Ed.2d 456 (2000).

In order for Williams to prevail at the pretext stage, he must prove that the reasons stated by the defendants for his termination (1) have no basis in fact; (2) did not actually motivate his discharge; or (3) were insufficient to motivate his discharge. *Smith v. Hinkle Mfg., Inc.*, No. 00–3320, 36 Fed.Appx. 825, 829, 2002 WL 1215607, at *4 (6th Cir. June 4, 2002) (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994)).

Under the first method of proving pretext, Williams must present evidence that the proffered basis for his termination never happened. *Id.*

In order to rely on the second way of proving pretext, Williams must show that the weight of the circumstantial evidence of discrimination makes it more likely than not that the defendants' explanation is a pretext. *Id.* at 830, 2002 WL 1215607, *5. Williams may not confine himself to the evidence establishing his prima facie case, but he must introduce additional evidence of discrimination. *Id.*

The final way to prove pretext usually " 'consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in [conduct] substantially identical ... to that which the employer contends motivated its discharge of the plaintiff.' " *Id.*

■ The merits of this claim are based on Williams' alleged disability of diabetes and a heart condition for which he has had bypass surgery.[6] Williams maintains that his diabetes and heart condition substantially limit the major life activities of walking and breathing. Both are major life activities as described by the EEOC regulations. 45 C.F.R. § 84.3(j)(2)(ii)(2001).

The court need not make a detailed factual inquiry into whether Williams' limitations in walking and breathing constitute a disability because he has failed to produce evidence that rebuts the nondiscriminatory reason articulated by the employer. *See, e.g., Brune v. BASF Corp.*, 41 F.Supp.2d 768 (S.D.Ohio 1999), *aff'd in part, rev'd on other grounds*, No. 99–3194, 2000 WL 1597908 (6th Cir. Oct.17, 2000).

---

5. The court notes this is the rare case in which, although the plaintiff is most likely limited in a broad range of jobs, his job with the City was one which he could do. There was no need for Williams to request reasonable accommodations because they were already built into the position allowing Williams to perform his job without limitation. From the record, it appears that many of Williams' duties could be performed via telephone. His schedule appeared to be flexible, allowing him to have time off as needed for doctor appointments and other adjustments necessary for his condition.

6. In his brief, Williams primarily relies on his condition of diabetes.

Williams was hired as superintendent in late 1992, after he was diagnosed with diabetes. Williams testified only that his health had "progressively gone downhill a *little bit*" due to mobility problems. (Williams' dep. vol. 1 pp. 73–74)(emphasis added). However, it is undisputed that Williams was in fact doing his job and that any mobility problems were not interfering with the performance of his job while Mayor Smith was in office due to the built-in accommodations of the position.

Mayor Smith was elected in 1994.[7] Williams fails to explain why, if Mayor Smith was truly concerned about the status of Williams' health, he would wait from 1994 until 2001 before terminating him. The Sixth Circuit affirmed the district court in *Brune*, 41 F.Supp.2d at 777, wherein the court held that "common sense dictates that if [defendant] wanted to terminate [plaintiff] because of her disability it would not have waited five years to do so." In the present case, Mayor Smith waited seven years before terminating Williams.

■ Regardless of this fact, Williams argues he has direct evidence of disability discrimination. He alleges that Mayor Smith stated during the termination meeting that he was concerned Williams was not going to make it and that his health had been a "point of concern." (Williams' dep. vol. I pp. 103–104). The Mayor denies making these statements, and it is undisputed that it was Williams who initially brought up the issue of his health during the meeting. Even accepting that these statements were made, Williams has failed to show that Mayor Smith would not have taken the same actions in spite of any disability on the part of Williams. *See Preston v. Berendsen Fluid Power*, 125 F.Supp.2d 245, 251 (W.D.Mich.2000) (citing *Laderach v. U–Haul of Northwestern Ohio*, 207 F.3d 825, 829 (6th Cir.2000)). Nor has Williams explained why the Mayor would have waited seven years before terminating him.

Moreover, because Williams' contract was void, he was an employee at will and could be discharged for any reason whatsoever. Mayor Smith testified in his deposition that Williams did not get along well with the public, businesses, different organizations and political figures, including the Industrial Authority and the Laurel County Judge Executive. (Mayor Smith dep. pp. 31–38). Additionally, the Mayor stated that Williams' failure to try to work out problems with different entities and discuss issues with them contributed to his decision. (Mayor Smith dep. p. 40). The Mayor also testified that he personally had to take care of a lot of problems which Williams should have been handling. (Mayor Smith dep. pp. 40–48). Further, there were allegations made by Ken Wilson, an engineer, that Williams had engaged in illegal conduct.[8] (Mayor Smith dep. pp. 50–55).

The deposition testimony of Commissioner Hamm supports these reasons, and he was an ally of Williams. Hamm testified as follows:

A. No, that was—his health wasn't—wasn't a reason. That wasn't a reason, in his mind—

---

7. Mayor Smith had also served an earlier term from 1978 through 1982. (Mayor Smith dep. p. 15).

8. These allegations included illegally constructing water and sewer lines; improperly using the Commission's tools, facilities and employees; employees using Commission equipment for personal use; improperly using office equipment; improperly granting sewer connections; waiving cut-off fees for some customers; and improperly using employees to work at the residence of a former Commission Chairman. Williams admitted some of these allegations. (Williams' Resp. to the City's Mot. for Summ. J. ex. 5).

Q. In the Mayor's mind?

A. In the Mayor's mind. Because [Williams'] in poor health wasn't the reason . . . .

Q. I understand. But the Mayor never said to you, that's not a reason during that meeting; right?

A. He never said that that's not the—I don't—I don't know if he said that or not. I really don't recall. But that wasn't—that wasn't his intent, because he was in bad health, no.

Q. You said he said something like, yeah, I was worried about him a while ago, something, he was in real bad shape a while ago?

A. Several months back he was, yeah.

Q. You also went through a discussion—it was kind of a long answer, so I'm trying to remember all of it—a discussion of where you were asking the Mayor for specific examples of—why Mike was doing things, basically, why Mike was being terminated; correct?

\* \* \* \* \* \*

A. Yes.

Q. And the only specific example that the Mayor gave was this Ken Wilson complaint; correct?

A. That and lying.

(Hamm dep. pp. 135–136).

Williams cannot show the defendants' reasons for terminating his employment are pretextual. He presents no evidence that the stated reasons were not the real reasons for his termination.

■■■ Williams also argues that, even if the court does not find that he was disabled, he was "regarded as" such by the Mayor. He bases this argument on the same alleged statements made by Mayor Smith concerning Williams' health as he proceeds under the direct evidence method.

There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain *misperceptions about the individual*—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Cotter,* 287 F.3d at 599 (quoting *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999)) (emphasis added).

Even if Mayor Smith made the alleged statements regarding Williams' health, there is no evidence that the Mayor regarded Williams as disabled from doing his job or a broad range of jobs.[9] The evidence is that, despite any health issues, Williams was in fact doing his job. The Mayor never treated him any differently during the term of his employment based on his health. The fact that the Mayor waited seven years before taking any action supports that the reasons stated for Williams' termination were not pretextual

**9.** Because the major life activity under review from Mayor Smith's point of view was that of working, Williams must show that the Mayor regarded him as unable to work in a broad class of jobs. *Cotter,* 287 F.3d at 599 (citing *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139) "An employer does not necessarily regard an employee as disabled 'simply by finding the employee to be incapable of satisfying the singular demands of a particular job.' " *Id.* (quoting *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir.1996)) (quotation marks and citations omitted in *Cotter* ).

and that Williams was not regarded as disabled.

The defendants have also argued that, pursuant to *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802–803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999),[10] Williams cannot explain the contradictory statements regarding his applications for disability and his argument under the ADA that he was a qualified individual with a disability prior to his termination. The defendants rely on this argument alternatively for summary judgment on Williams' ADA claims. However, because the court has found for the defendants on all of Williams' claims under the ADA, the court finds it unnecessary to review this matter.

*3. Williams' claims of intentional infliction of emotional distress and outrageous conduct fail.*

 Williams brings a claim for intentional infliction of emotional distress and outrageous conduct in relation to the release of certain documents to the *London Sentinel Echo* which made a request under the Open Records Act.

The Open Records Act request was addressed to Mayor Smith and included "any disciplinary action and/or preliminary and final reports of disciplinary action" concerning Williams. The City, through its attorney, Larry Bryson, responded to the request providing copies of minutes from a closed session meeting relating to the Ken Wilson allegations as stated previously in footnote eight regarding allegations of Williams' mismanagement of the Water Commission. The newspaper thereafter published these minutes in their entirety.

 In order to establish a claim for the tort of intentional infliction of emo-

10. In *Cleveland,* 526 U.S. at 806, 119 S.Ct. 1597, the Court held that although application for or receipt of disability benefits does not necessarily preclude an ADA suit, a plain-

tional distress or outrageous conduct, Williams must prove the following elements: "[t]he wrongdoer's conduct must be intentional or reckless; the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; there must be a causal connection between the wrongdoer's conduct and the emotional distress and the distress suffered must be severe." *Osborne v. Payne,* 31 S.W.3d 911, 913–14 (Ky.2000). This tort "is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees." *Id.* (citing *Kroger Co. v. Willgruber,* 920 S.W.2d 61 (Ky.1996)).

The City and the Mayor respond that the records were properly turned over pursuant to Kentucky law. They rely on KY. REV. STAT. ANN. § 61.872 (Michie 1993), which provides that "[a]ll public records shall be open for inspection by any person. . . ." Exemptions from the Open Records Act are included in KY. REV. STAT. ANN. § 61.878 (Michie 1993). The exemption which Williams apparently relies upon is subsection (a) which exempts "[p]ublic records containing information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy."

 Judicial review of a disclosure decision must be approached on a case-by-case basis. *Palmer v. Driggers,* 60 S.W.3d 591, 597 (Ky.Ct.App.2001). The court in *Palmer,* 60 S.W.3d at 597–98, quoted *Kentucky Bd. of Examiners v. Courier–Journal & Louisville Times Co.,* 826 S.W.2d 324, 327–28 (Ky.1992) in great length as follows:

tiff must proffer a sufficient explanation of any apparent inconsistencies between the ADA claim and previous sworn statements made in an application for disability benefits.

The language of subsection (1)(a) implies a number of ... conclusions.... First, it reflects a public interest in privacy, acknowledging that personal privacy is of legitimate concern and worthy of protection from invasion by unwarranted public scrutiny. We are therefore spared debate (or deprived of it) on privacy as a matter of natural right or constitutional law. *Second, the statute exhibits a general bias favoring disclosure.* An agency which would withhold records bears the burden of proving their exempt status. KRS 61.882(3). The Act's "basic policy" is to afford free and open examination of public records, and all exceptions must be strictly construed. KRS 61.882(4), *supra. Third, given the privacy interest on the one hand and, on the other, the general rule of inspection and its underlying policy of openness for the public good, there is but one available mode of decision, and that is by comparative weighing of the antagonist interests. Necessarily, the circumstances of a particular case will affect the balance.* The statute contemplates a case-specific approach by providing for de novo judicial review of agency actions, and by requiring that the agency sustain its action by proof. Moreover, the question of whether an invasion of privacy is "clearly unwarranted" is intrinsically situational, and can only be determined within a specific context [emphasis added].

The public's "right to know" under the Open Records Act is premised upon the public's right to expect its agencies properly to execute their statutory functions. In general, inspection of records may reveal whether the public servants are indeed serving the public, and the policy of disclosure provides impetus for an agency steadfastly to pursue the public good.

The issues which were discussed in the closed session regarding Williams included, among others, misappropriating the Water Commission's tools, facilities and employees; doing personal favors for friends; illegally constructing sewer and water lines; and waiving charges for some customers. All of the allegations clearly involved inappropriate conduct in connection with Williams' position as superintendent of the Water Commission.

Based on the individual inquiry this court must make into the personal nature of the information, the information clearly involved the operation of a public agency. This would not "constitute a clearly unwarranted invasion of personal privacy." The public certainly has an interest in the manner in which its tax dollars are being used or misused. The allegations involved Williams' alleged mismanagement of the Water Commission, and he admitted several of the allegations. Accordingly, the court finds the minutes were properly produced to the newspaper and dismisses Williams' claim for intentional infliction of emotional distress and outrageous conduct. Even if the records were not required to be published, doing so on request of a newspaper would not meet the stringent standards for this tort.

Therefore, the parties having been heard, and the court being duly advised,

**IT IS ORDERED** that the defendants' motion for summary judgment (doc. # 63) and motion to file supplemental reply (doc. # 93) be, and they are, hereby **granted**. The plaintiff's motion for partial summary judgment (doc. # 60) be, and it is, hereby **denied**. A separate judgment shall be entered concurrently herewith.

### *JUDGMENT*

Pursuant to the Opinion and Order entered currently herewith,

**IT IS HEREBY ORDERED AND ADJUDGED** that the motions for summary

judgment of all defendants be, and they are, hereby **granted**; judgment is hereby entered for the defendants; and that this matter is hereby **dismissed**, at the cost of the plaintiff, and **stricken** from this court's docket.