**Kathy SMITH and John Smith,**
**Plaintiffs–Appellants,**

v.

**HINKLE MANUFACTURING, INC.,**
**Don Marriott, and Joe Graden,**
**Defendants–Appellees.**

No. 00–3320.

United States Court of Appeals,
Sixth Circuit.

June 4, 2002.

Before NELSON and BATCHELDER, Circuit Judges, and FEIKENS, District Judge.*

NELSON, Circuit Judge.

Shortly after plaintiff Kathy Smith informed her employer, defendant Hinkle Manufacturing, Inc., that her young son had been diagnosed with a serious medical condition, Hinkle fired her. Mrs. Smith and her husband subsequently initiated the present suit against Hinkle and two of its managers, alleging among other things that the discharge violated the Employee Retirement Income Security Act (ERISA), the Americans with Disabilities Act, and Ohio anti-discrimination law. The district court entered summary judgment in favor of the defendants on all counts. We shall reverse the judgment as to the ERISA

claim and affirm the district court's disposition of the remainder of the case.

I

Kathy Smith started as a customer service representative for Hinkle in January of 1998. She was one of about 130 employees on the Hinkle payroll, and she worked under the direct supervision of defendant Joseph Graden, the customer service manager. Mrs. Smith's job required her to interact regularly with Hinkle staff people, with customers of the company, and with sales representative Thomas Yellstrom. Mrs. Smith had worked at Hinkle less than 11 months when she was fired, allegedly for poor performance.

The first evidence of problems in Mrs. Smith's performance dates from May of 1998. Contemporaneous hand-written notes prepared by Mr. Graden memorialize a complaint from one of Hinkle's customers, Excel of Tennessee, concerning Mrs. Smith's supposed failure to tell the appropriate people at Hinkle about orders placed by Excel. Hinkle took no disciplinary action against Mrs. Smith in this connection.

Mr. Smith was diagnosed with heart disease in late May or early June, and Mrs. Smith considered resigning from Hinkle at that time. Mr. Graden testified in his deposition that he and co-defendant Donald Marriott, the plant manager, urged her to stay. She decided to do so.

At the end of June and beginning of July, Mrs. Smith participated with Messrs. Graden, Yellstrom and Marriott in meetings about the company's expectations for her. E-mail communications sent in connection with the meetings indicate that Mrs. Smith needed to improve her perfor-

---

* The Honorable John Feikens, United States District Judge for the Eastern District of Michigan, sitting by designation.

mance in certain areas. Mrs. Smith says that she was not informed of any specific customer complaints, however.

In August of 1998 Mrs. Smith underwent a six-month performance review. Using a salaried employee appraisal form with a five-level scale that ranged from "unsatisfactory" to "outstanding," the company graded her on each of ten different "performance factors." Detailed comments and suggestions for improvement were provided with respect to each factor. For the most part Mrs. Smith received good marks, but she was rated only "fair"—the second-to-worst grade—on "project management" and "inside account management." She was rated "fair to good" in a factor called "proficiency." The comments on the factors as to which Mrs. Smith received low grades emphasize that she needed to have better follow-up, to improve in problem solving and technical ability, to develop a better understanding of the inside warehousing system, to return phone calls in a timely fashion, to understand key customer requirements, and to understand the inside development process for new projects.

Mr. Marriott signed off on an 8% pay raise for Mrs. Smith on September 30, 1998. The salary increase was granted in the midst of what was apparently another contretemps with Excel of Tennessee. The Excel incident prompted Mr. Yellstrom to send several e-mails to Mrs. Smith asking her to complete a customer complaint form, but a handwritten note on a hard copy of the electronic correspondence indicates that the customer did not want to lodge a formal complaint.

On October 26, 1998, Mrs. Smith obtained Mr. Graden's permission to absent herself from work on October 28 so she could take her eight-year old son, Zachary,

to a neurosurgeon. The neurosurgeon diagnosed Zachary with hydrocephalus, or water on the brain, and recommended immediate surgery. Without it, he said, Zachary would die.[1]

Mrs. Smith returned to work later in the day on October 28 and told Mr. Graden what the diagnosis was. They discussed the seriousness of Zachary's condition, the risks of surgery, and the likely need for post-operative care. Mr. Graden told Mrs. Smith to speak with the accounting supervisor, Nancy Makin, about the availability of leave under the Family and Medical Leave Act.

On November 12, approximately two weeks after Zachary's diagnosis, Hinkle terminated Mrs. Smith's employment. Mr. Graden wrote a memorandum, dated November 12, detailing the events that purportedly led to Mrs. Smith's dismissal. In the memorandum Mr. Graden describes Mrs. Smith's performance as "intolerable" and notes that "follow-up with customers has been poor of late." There is a discussion of five separate customer complaints, the earliest of which dates from the week of October 26—the same week in which Zachary was taken to the neurologist.

An affidavit executed by Mrs. Smith in the course of the litigation makes reference to a conversation she had with Accounting Supervisor Makin prior to the termination. Ms. Makin allegedly told Mrs. Smith that families like hers were the cause of Hinkle's rising insurance costs and were a "drain on the company." (It is undisputed that Hinkle maintained a health insurance plan, paid for by the company, that constituted an employee welfare benefit plan governed by ERISA. See 29 U.S.C. § 1002(1).) Ms. Makin denies having made the "drain on the company"

---

1. The Smiths later sought a second opinion, on the strength of which they decided that

Zachary should be treated with medication as opposed to surgery.

statement at any time, and she admits to having discussed insurance costs with Mrs. Smith only after the termination. Mrs. Smith on the other hand, testified at her deposition that the discussion occurred before the termination and "we discussed the fact that there had just been a meeting at Hinkle's Corporate Offices in regards to health care and the rising costs. . . ."

Mrs. Smith and her husband filed their lawsuit in April of 1999, approximately four months after Mrs. Smith's discharge. The district court entered summary judgment in favor of the defendant on February 9, 2000. A timely appeal followed.

## II

### A

ERISA makes it illegal for an employer to "discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee welfare benefit] plan. . . ." 29 U.S.C. § 1140. The plaintiffs claim that Hinkle and its managers fired Mrs. Smith in order to avoid increased health insurance costs, thereby violating § 1140.

To prevail on this claim at trial, the plaintiffs would have to prove the existence of "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.1992). The plaintiffs would not have to show that the defendants' "sole purpose" was one of interfering with the right to receive health benefits, provided that interference with such benefits "was 'a motivating factor' in the decision." *Id.*

Mrs. Smith's discharge unquestionably prevented her from exercising her rights under the company's health plan. The question, accordingly, is whether there is evidence from which a trier of fact could properly infer that when Hinkle terminated Mrs. Smith's employment, the company had "the purpose of interfering with" Mrs. Smith's receipt of benefits under the ERISA plan.

Where there is no direct evidence that an employer intended to interfere with a plaintiff's rights under ERISA, courts employ the burden-shifting apparatus described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Humphreys*, 966 F.2d at 1043, and *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Under *McDonnell Douglas*, the plaintiff has the burden of making out a prima facie case of improper discrimination. If the plaintiff carries that burden, it becomes the defendant's burden to articulate a non-discriminatory reason for the challenged action. See *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097. Once it is determined that the defendant has articulated such a reason— and this determination "can involve no credibility assessment"—the *McDonnell Douglas* apparatus "disappears," leaving the plaintiff to prove a case, if possible, in the conventional manner. *Id.* at 142–43, 120 S.Ct. 2097.

In the matter now before us, only the alleged statement of Ms. Makin might be thought to constitute direct evidence of an intent to economize on insurance premiums. Because Ms. Makin did not have the authority to fire Mrs. Smith, however, we are not inclined to treat Mrs. Smith's version of the Makin conversation as "direct" evidence of the employer's intent. See *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir.1998). Accordingly, the burden-shifting approach of *McDonnell Douglas* comes into play.

Under that approach, as we have said, the plaintiff has the burden of making out a prima facie case. See *Smith v. Ameritech,* 129 F.3d 857, 865 (6th Cir.1997). Although this burden is not meant to be a heavy one, see *Christian v. Wal–Mart Stores,* 252 F.3d 862, 870 (6th Cir.2001), the district court concluded that Mr. and Mrs. Smith had failed to carry it. The court's conclusion is a curious one, the defendants themselves having conceded in the reply brief they filed with the district court in support of their motion for summary judgment that the plaintiffs "have made a prima facie case...."

■ We have said elsewhere that temporal proximity between termination of employment and an event signaling increased costs to a benefit program can "support an inference that the adverse actions were taken with the intent of interfering with future ... benefits." *Smith,* 129 F.3d at 865; see also *Pennington v. Western Atlas, Inc.,* 202 F.3d 902, 908 (6th Cir.2000)(finding prima facie case established "based upon the proximity of Plaintiffs' discharge to their age of receiving full retirement benefits"); *Shahid v. Ford Motor Co.,* 76 F.3d 1404, 1411 (6th Cir.1996)(finding proximity of discharge to date of eligibility for benefits was prima facie evidence of discrimination); *Humphreys,* 966 F.2d at 1043–44 (finding that plaintiff carried prima facie burden because "the proximity to vesting provides at least some inference of intentional, prohibited activity"). Here Mrs. Smith was discharged two weeks after her supervisor learned of her son's hydrocephalus, and it is uncontested that the boy's condition was one that could well lead to the imposition of substantial costs on Hinkle's insurer. The evidence, in our view, was sufficient to establish a prima facie case.

Hinkle rebutted the presumption of improper motive, of course, by articulating a valid reason for the termination—*i.e.,* that Mrs. Smith's job performance had been unsatisfactory. The burden-shifting apparatus therefore dropped away, leaving only the issue of "discrimination *vel non.*" *Reeves,* 530 U.S. at 142–43, 120 S.Ct. 2097.

A plaintiff may prevail at this stage by demonstrating that the employer's proffered explanation for its actions is merely a pretext for discrimination. See *id.* at 143, 120 S.Ct. 2097. The plaintiff must "either prove that the interference was a motivating factor in the employer's actions or prove that the employer's proffered reason is unworthy of credence." *Smith,* 129 F.3d at 865 (quoting *Humphreys,* 966 F.2d at 1043). The requisite proof may consist of evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the plaintiff's] discharge, or (3) that they were insufficient to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994)(emphasis deleted).

As the *Manzer* opinion points out, evidence within the first and third categories is "easily recognizable." *Id.* We recognize no such evidence here.

To prove that an employer's explanation has "no basis in fact," (category 1 in the *Manzer* taxonomy), the plaintiff must present "evidence that the proffered bases for ... discharge never happened...." *Id.* In the case at bar the Smiths do not deny that several customers complained about Mrs. Smith's performance. The Smiths thus cannot demonstrate that the stated reasons for the discharge were "unworthy of credence" in the sense that they had no basis in fact.

The third type of showing described in *Manzer* usually "consists of evidence that other employees, particularly employees not in the protected class, were not fired

even though they engaged in [conduct] substantially identical ... to that which the employer contends motivated its discharge of the plaintiff." *Id.* Again, the plaintiffs in the case at bar have not offered any such evidence. Nothing in the record indicates that other employees who had problems dealing with customers were not fired, or that employees who were not covered by Hinkle's health insurance plan—if there were any such employees—fared better than those who were covered.

*Manzer* characterizes the second category of proof as a more "indirect" attempt to undermine the employer's credibility. *Id.* The plaintiff must "argue[ ] that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* In this regard a plaintiff may not confine herself to the evidence establishing her prima facie case, but must "introduce additional evidence of ... discrimination." *Id.*

*Manzer's* second category is consistent with *Smith's* acknowledgment that one route by which a plaintiff may prevail is to simply "prove that the interference [with protected rights] was a motivating factor in the employer's actions." 129 F.3d at 865. In other words, summary judgment is improper if the plaintiffs' evidence of discrimination is such that a reasonable jury could find that the employer was motivated, at least in part, by illicit considerations, regardless of the employers' proffered reasons for its action.

■ We conclude that the evidence presented here could support an inference that Hinkle's discharge of Mrs. Smith was at least partially motivated by a desire to interfere with her health insurance. The discharge occurred only two weeks after Mrs. Smith informed her supervisor of her son's serious health problem, and all of the customer complaints documented in Mr.

Graden's November 12 memo dated from that same two-week period. The statements of Ms. Makin, if a jury were to believe Mrs. Smith's version of what Ms. Makin said, would suggest that Hinkle as a company was concerned with health care costs and with the financial effect of continuing to cover Mrs. Smith's family. The undisputed fact that Mrs. Smith received an 8% pay raise approximately six weeks before her discharge could lead a jury to infer that Hinkle was not as dissatisfied with Mrs. Smith's performance as it claimed to be. Mr. Graden admitted, moreover, that he had warned other employees between five and 50 times before firing them—yet Mrs. Smith appears to have been warned only once, two days before she was fired. We are obligated to view the record in the light most favorable to the party not moving for summary judgment, of course, and, having done so, we are satisfied that summary judgment should not have been granted on the Smiths' ERISA claim.

B

The plaintiffs also challenge the grant of summary judgment on their claims under the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(4), and a purportedly analogous Ohio anti-discrimination statute, Ohio Rev.Code § 4112.02(A). In this connection the plaintiffs maintain that Hinkle fired Mrs. Smith because of her "association" with her son, whom Hinkle allegedly "perceived" as having a disability.

The Americans with Disabilities Act prohibits discrimination against a "qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). The Ohio handicap discrimination statute contains no comparable prohibition against associational discrimination. See Ohio

Rev.Code Ann. § 4112.02. And although Ohio courts sometimes look to federal law for guidance in disability discrimination cases, they do so only insofar as the ADA is "similar" to the Ohio law. *City of Columbus Civil Service Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206–07 (1998). The plaintiffs' claim under Ohio Rev.Code § 4112.02(A) has no merit.

■ We do not believe that the plaintiffs have presented sufficient evidence to avoid summary judgment on their ADA claim. Section 12112(b)(4), as quoted above, subjects an employer to liability for an adverse employment action occasioned by the employee's relationship to someone with a disability. To qualify as disabled a person must have: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) be[ ] regarded as having such an impairment." 42 U.S.C. § 12102(2). Here the plaintiffs produced no evidence that their son's medical condition limits his major life activities. They rely instead on the theory that Hinkle "perceived" Zachary as having a disability. The only evidence offered in support of this theory is Mr. Graden's suggestion that Mrs. Smith consider taking time off under the Family and Medical Leave Act. The making of such a suggestion hardly shows that Hinkle perceived the Smith's son as having a disability. *Cf. Kvintus v. R.L. Polk & Co.*, 3 F.Supp.2d 788, 796 (E.D.Mich.1998), *aff'd* 194 F.3d 1313 (6th Cir.1999)(unpublished)(refusing to infer perception of disability from an employer's offer to plaintiff of a paid medical leave). The claim under § 12112(b)(4) thus fails as a matter of law.

The judgment entered by the district court is REVERSED insofar as the ERISA claim is concerned and AFFIRMED in all other respects. The case is REMANDED for further proceedings not inconsistent with this opinion.