**NOT RECOMMENDED FOR PUBLICATION**

File Name: 13a0189n.06

**Nos. 11-3459, 11-3468, 11-3815**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Feb 20, 2013*

DEBORAH S. HUNT, Clerk

| | |
|---|---|
| YOLANDA ARNOLD, et al., | ) |
| | ) |
| Plaintiffs-Appellants, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR |
| CITY OF COLUMBUS, | ) THE SOUTHERN DISTRICT OF |
| | ) OHIO |
| Defendant-Appellee. | ) |
| | ) |
| | ) |
| | ) |

Before:  SILER and WHITE, Circuit Judges; REEVES, District Judge.[*]

**SILER**, Circuit Judge.  Plaintiffs, current and former employees of the City of Columbus'

Division of Fire ("CDF"), brought this action against the City, alleging discrimination, hostile work

environment, and retaliation under Title VII of the Civil Rights Act of 1964 and the Ohio Civil

Rights Act ("OCRA"), First Amendment retaliation and equal protection claims pursuant to 42

U.S.C. § 1983, and a number of state law claims.  The district court granted summary judgment to

Columbus on the federal and OCRA claims and declined to exercise supplemental jurisdiction over

the remaining state law claims.  For the following reasons, we affirm.

---

[*]The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I.

Plaintiffs Yolanda Arnold, Eddie Arnold, Dayle Boyce, Terry Cornett, Melvin Houston, Tyrone Redmond, George Rickman, Robert Taylor, Robert Maxwell, and Virgil Moore are current and former members of CDF's Inspections section, a component of the Fire Prevention Bureau ("FPB"), which is one of five bureaus in CDF. FPB and specifically the Inspections section work in conjunction with the civilian employees of Building Services to conduct building code and fire code inspections. Plaintiffs claim that Building Services is predominantly staffed with Caucasian employees while the Inspections section is almost exclusively black.

Yolanda Arnold, an African-American woman, is a Battalion Chief ("BC")[1] who was transferred from FPB to Emergency Services in 2006. As BC of FPB, she was in charge of overseeing the daily activities of each of the FPB sections. She reported to AC Gregory Paxton, the head of FPB, until he was removed in 2005. She then reported to AC Kerry Ellis.

Plaintiffs Eddie Arnold, Boyce, Cornett, Houston, Redmond, Rickman, and Taylor are African-American employees of CDF who have worked in the Inspections section. Plaintiffs Maxwell and Moore are Caucasian CDF employees pursuing their civil rights claims on an association theory.

The claims in this case involve three investigations of FPB. The first investigation occurred in response to allegations that Inspections-section employees were failing to show up for inspections and were being paid for overtime not actually worked. In 2004, AC Paxton, who is Caucasian,

---

[1] CDF's hierarchy is: Fire Chief, Executive Officers ("EOs"), Assistant Chiefs ("ACs"), Deputy Chiefs ("DC"), BCs, Captains, Lieutenants and firefighters. The administrative head of CDF is the Safety Director, who oversees both CDF and the Columbus Police Department. At all relevant times, the Fire Chief was Ned Pettus and the Safety Director was Mitchell Brown.

learned of the allegations and informed EO Richard Braun. In response, Braun called for an investigation. The investigation into missed inspections was conducted internally by the Professional Standards Unit ("PSU"). The allegations of theft prompted Safety Director Brown to call for an investigation by the Columbus Police Department ("CPD"), which was conducted contemporaneously with the PSU investigation. Neither the CPD nor the PSU investigations found any specific wrongdoing on the part of Yolanda Arnold or the Inspections section, although EO Braun concluded that "[t]here appears to have been a failure in the procedure to assign and follow-up on inspections." At the conclusion of these investigations in February and March 2005, AC Paxton was reassigned and was replaced by AC Ellis.

Around April 2005, Yolanda Arnold realized that certain inspections records were missing. She believed that Lieutenant Randall Daum, a Caucasian former FPB employee who, according to Arnold, had demonstrated racial animus in the past, was responsible for taking the records. During a PSU investigation into this matter, Yolanda Arnold stated that employees Rhonda Sipe and James Sawyers both said that Daum placed the records in a box and left with them. When interviewed, both Sipe and Sawyer denied seeing Daum take records and Sawyers denied telling Yolanda Arnold that he had witnessed Daum taking the records. Yolanda Arnold was subsequently charged with dishonesty, and, following a disciplinary hearing, Fire Chief Pettus, who is African-American, recommended an eighty-hour suspension. She appealed to the Civil Service Commission ("CSC"), which dismissed the dishonesty charge and instead found a "lack of diligence" on her part. Her suspension was reduced from eighty to forty hours. In the meantime, the local newspaper, the Columbus *Dispatch*, ran a number of negative stories about CDF and the Inspections section.

In May 2005, Yolanda Arnold sent a memo to Fire Chief Pettus with the subject line "Disparate Treatment and Policy Violations." She also filed her first charge with the Ohio Civil Rights Commission ("OCRC"). In part due to her allegations of discrimination and the lingering questions and dysfunction surrounding FPB, Safety Director Brown ordered a third investigation. This investigation was conducted by a third party, attorney Pamela Krivda ("Krivda investigation"). Yolanda Arnold was allegedly interviewed eight times during the course of the Krivda investigation. Many of the Plaintiffs took issue with the presence of a union representative during their interviews with Krivda.

Krivda concluded her investigation and report in 2006, finding no purposeful wrongdoing on the part of Yolanda Arnold or anyone else at FPB or the Inspections section. She determined that the majority of missed inspections were the result of "a breakdown in communications" between Building Services and FPB or FPB's failure to assign the inspection to an inspector. Krivda also addressed Yolanda Arnold's claims of discrimination, finding them to be unsubstantiated.

At the conclusion of the Krivda investigation in 2006, Yolanda Arnold was removed from FPB based on the continuing problems there and her disciplinary suspension. She retained her salary and the title of BC, but she was moved to Emergency Services. She testified that, in her new position, she works on "administrative duties" and no longer manages a large staff like she had at FPB. In 2007, she filed an Equal Employment Opportunity Commission ("EEOC") charge related to the three investigations and her suspension. The 2007 charges filed by Plaintiffs Eddie Arnold, Boyce, Cornett, Houston, Redmond, Rickman and Taylor related to the investigations, the presence of a union representative during interviews, the requirement to complete time sheets, and the loss of remote parking privileges.

Maxwell and Moore also filed their EEOC complaints in 2007. They assert that the investigations of FPB and the accompanying press coverage singled them out for "public and false allegations of 'criminal' wrongdoing" along with their African-American colleagues. Specifically, Moore's picture was displayed on the front page of the local newspaper with the headline "City Fire Inspectors Often Fail To Show." They also assert that other similarly-situated Caucasian FPB employees did not have their Krivda-investigation interviews tape-recorded or have a union representative present because they were not associated with the African-American employees, and that Krivda was more antagonistic in her interviews of Maxwell and Moore. Moore was also the subject of an investigation for back-timing and an additional investigation, for unknown purposes, that bore no result.

Plaintiffs filed suit in 2008.[2] The district court granted summary judgment for Columbus in each case.

**II.**

We review the district court's grant of summary judgment *de novo*. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 311 (6th Cir. 2010). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 399 (6th Cir. 2009).[3]

---

[2] This opinion addresses the appeals in Nos. 11-3459, 11-3468, and 11-3815. The appeal of Wesley Fullen, No. 11-3457, is addressed in a separate opinion.

[3] Plaintiffs argue that Columbus failed to meet its initial burden of demonstrating that there are no genuine issues of material fact. Columbus's burden "'may be discharged by 'showing'–that is,

## III.

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, with regard to individuals in protected classes, the OCRA makes it unlawful for an employer "to discharge without just cause, to refuse to hire, or otherwise to discriminate against [a] person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code Ann. § 4112.02(A). The same analysis generally applies to claims under Title VII and the OCRA. *Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 631 (6th Cir. 2008); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981).

"Title VII [also] forbids discrimination on the basis of association with or advocacy for a protected party." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Section 4112.02 of the OCRA similarly prohibits discrimination based on association. *Ohio Civil Rights Comm'n. v. Lysyj*, 313 N.E.2d 3, 6 (Ohio 1974) (holding that discrimination based on association is forbidden in public accommodations) (superceded by statute on the availability of punitive damages, as recognized in *Rice v. CertainTeed Corp.*, 704 N.E.2d 1217 (Ohio 1999)); *see Cole v. Seafare Enters.*

---

pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case.'" *Wright v. Murray Guard*, 455 F.3d 702, 706 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

*Ltd., Inc.*, No. C-950157, 1996 WL 60970, at *1-*2 (Ohio Ct. App. Feb. 14, 1996) (applying *Lysyj* to associational employment-discrimination case brought under OCRA § 4112.02).[4]

At the summary-judgment stage, a plaintiff must adduce either direct or circumstantial evidence of race discrimination. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). Plaintiffs concede that they do not pursue a direct-evidence theory, so the *McDonnell Douglas*/*Burdine* burden-shifting framework for circumstantial evidence applies. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, the plaintiff must make out a prima facie case of race discrimination, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision. *Upshaw*, 576 F.3d at 584. If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual. *Id.* Throughout this burden-shifting process, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).

The majority of the Plaintiffs cannot establish a prima facie case because they did not suffer an adverse employment action. Although Yolanda Arnold suffered two adverse actions in her suspension and alleged reduction in responsibilities and benefits upon being transferred from FPB to Emergency Services, her race-discrimination claim fails because she cannot demonstrate that

---

[4] In *Smith v. Hinkle Mfg., Inc.*, 36 F. App'x 825, 830-31 (6th Cir. 2002), we held in an unpublished decision that § 4112.02 does not apply to associational employment discrimination cases in the context of disability discrimination. However, as noted in *Berry v. Frank's Auto Body Carstar, Inc.*, 817 F. Supp. 2d 1037, 1048-49 (S.D. Ohio 2011), *Smith* did not analyze either *Lysyj* or *Cole* in making this determination. We will assume that the district court correctly ruled that Maxwell and Moore could pursue their state discrimination claims on an association theory.

Columbus's legitimate, nondiscriminatory reasons for the adverse employment actions were pretextual.

## A. Prima Facie Case

To establish a prima facie case, a plaintiff must show that: "1) he is a member of a protected class; 2) [he] was qualified for the job; 3) he suffered an adverse employment decision; and 4) [he] was replaced by a person outside the protected class or treated differently than similarly non-protected employees." *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). The parties concede that Plaintiffs Yolanda Arnold, Eddie Arnold, Boyce, Cornett, Houston, Redmond, Rickman, and Taylor are members of a protected class and qualified for their jobs. Columbus does not dispute that Maxwell and Moore meet the first two elements of a prima facie case. Therefore, the dispute turns on the third and fourth elements.

The district court determined that only Yolanda Arnold's forty-hour suspension qualified as an adverse employment action, but Plaintiffs argue that a number of other actions also qualify. These include the investigations into FPB,[5] the media coverage of Arnold and the other FPB firefighters, the loss of remote parking privileges, the requirement to complete time sheets, the presence of a union representative during interviews, and the use of tape-recording during interviews. Yolanda Arnold additionally argues that her removal from FPB and placement in Emergency Services constitutes an adverse employment action.

---

[5] As the district court determined, Plaintiffs' Title VII race discrimination claims regarding the PSU and CDP investigations are time-barred because they did not file their EEOC charge within 300 days of the conclusions of the investigations. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001). Plaintiffs do not dispute this determination.

A materially adverse employment action "'must be more disruptive than a mere inconvenience or an alteration of job responsibilities,'" and a materially adverse change might be indicated by "'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (quoting *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002)).

First, employer investigations into suspected wrongdoing by employees, standing alone, generally do not constitute adverse employment actions. *See Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006); *Szeinbach v. Ohio State Univ.*, No. 11-3002, 2012 WL 324398, at *4-5 (6th Cir. 2012) (reversing district court's grant of summary judgment to the defendant employer in this Title VII retaliation case, holding that genuine issue of fact remained whether the employer's nearly two-year investigation of the plaintiff's publications constituted an adverse employment action where the plaintiff presented evidence that the investigation had a significant negative impact on her professional advancement); *Bivins v. U.S. Pipe & Foundry Co.*, 48 F. App'x 570, 572 (6th Cir. 2002) ("[T]he district court correctly concluded that mere investigations by an employer do not constitute adverse employment actions."). The cases cited by Plaintiffs do not support that investigations, standing alone, may constitute adverse employment actions. In *Hamilton v. Gen. Electric Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009), a Title VII retaliation case, we determined that the employer's increased scrutiny of the plaintiff after he filed an EEOC charge, in combination with the temporal proximity of the plaintiff's termination to his filing of the EEOC charge, was sufficient to establish the prime facie requirement of showing a causal nexus between the plaintiff's protected activity and

- 9 -

an adverse employment action. The adverse employment action in *Hamilton* was the plaintiff's termination. *Hamilton* did not address whether the employer's increased scrutiny, standing alone, constituted an adverse action. *Id. Speers v. Univ. of Akron*, 189 F. Supp. 2d 759, 766-67 (N.D. Ohio 2002), another Title VII retaliation case, also did not hold that investigations standing alone can constitute adverse employment actions, rather, the *Speers* court concluded that the plaintiff presented sufficient evidence that she suffered adverse employment action where "she received unwarranted disciplinary action, a reduction in compensation, and assignment to less favorable teaching assignments because of her protected activity." *Id.* at 767.

Nor do the negative media coverage and newspaper articles constitute adverse employment actions given that Plaintiffs do not establish that they suffered a materially adverse change in the terms or conditions of employment *because of their employer's actions*. *See Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999). Similarly, Plaintiffs did not demonstrate that the loss of remote parking privileges, the requirement to complete time sheets, and presence of a union official at interviews were more than "a mere inconvenience or an alteration of job responsibilities." *See Michael*, 496 F.3d at 594. Even if these constituted materially adverse employment actions, Plaintiffs cannot show that they were treated differently than similarly situated non-African-American employees. All of the inspectors were required to complete time sheets. Additionally, all fire inspectors were subject to the order to cease remote parking. Further, in sworn testimony, the union representative stated that he attended interviews of both African-Americans and Caucasians and tape-recorded all interviews he attended after being directed to do so. The discrimination claims of Eddie Arnold, Boyce, Cornett, Houston, Rickman, Taylor, Maxwell and Moore thus fail.

The district court correctly determined that Yolanda Arnold's forty-hour suspension for making false allegations against another employee constitutes an adverse employment action. In addition, CDF's transfer of Yolanda Arnold from FPB to Emergency Services qualifies as an adverse employment action. Transfers can be considered adverse actions if they are accompanied by a change in salary, benefits, title, or work hours, "significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Kocsis v. Multi-Care Mgmt., Inc.* 97 F.3d 876, 886 (6th Cir. 1996) (internal quotation marks omitted). Although she retained her salary and the title of Battalion Chief when she was transferred to Emergency Services, Yolanda Arnold presented evidence of "significantly diminished material responsibilities." *Id.* She testified that, in her new position, she works on "administrative duties" and no longer manages a large staff as she had at FPB. She also testified that she no longer has a city-assigned vehicle and is not reimbursed for the use of her personal vehicle for work. Thus, Yolanda Arnold presented sufficient evidence that her involuntary transfer to Emergency Services constituted an adverse employment action.

To satisfy the fourth element of a prima facie case of discrimination, Yolanda Arnold must point to a similarly-situated person outside the protected class who received more favorable treatment. A plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment for the two to be considered "similarly-situated." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). The plaintiff and the employees with whom the plaintiff seeks to compare himself or herself must be similar in "all of the relevant aspects." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). Factors to consider include whether the individuals "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would

distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). As the district court noted, because there were only about thirty Battalion Chiefs, Yolanda Arnold's BC position was somewhat "unique." This means that "[t]he number of employees with whom [she] could be compared for purposes of establishing a comparable is relatively small." *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396-97 (6th Cir. 2008). Especially in these circumstances, the "similarly situated" requirement should not be applied narrowly. *See id*.

AC Paxton and DC Butcher serve as appropriate comparatives for Yolanda Arnold to establish a prima facie case. Yolanda Arnold, Paxton, and Butcher are all high-ranking officers in CDF and are allegedly subject to the same standards. Yolanda Arnold testified that both Paxton and Butcher made false accusations against her regarding a promotional exam. Paxton allegedly stated in a letter to the Fire Chief that Yolanda Arnold's self-study for the exam was illegal, while Butcher allegedly accused her of cheating on the exam. Both allegations were apparently investigated and Yolanda Arnold was cleared. She alleges that no action was taken against Paxton or Butcher, even though she was investigated and ultimately suspended for leveling accusations against Lt. Daum. These facts, if true, would demonstrate that similarly situated persons outside of the protected class were treated more favorably than Yolanda Arnold. Therefore, she is able to establish a prima facie case of discrimination.[6]

_____

[6] Yolanda Arnold argues that she "was replaced by a person outside the protected class." *Newman*, 266 F.3d at 406. According to her, Captain Devlin, who is Caucasian, has acted as BC of FPB since she was removed, although this is apparently not a permanent placement. Chief Pettus, on the other hand, claims in his affidavit that she was replaced by BC Robert Jackson, who is African-American. It is unclear which account is correct, but, if Devlin has essentially replaced Yolanda Arnold, Devlin can also be used to satisfy the fourth element.

She also argues that she is similarly situated to AC Ellis and Lt. Daum. However, these

### B. Legitimate, Nondiscriminatory Reason

Once a prima facie case has been established, "[t]he burden then shifts to the employer 'to articulate some legitimate, nondiscriminatory reason' for its actions." *Newman*, 266 F.3d at 405 (quoting *McDonnell Douglas*, 411 U.S. at 802). Columbus articulated legitimate, nondiscriminatory reasons for both the suspension and the transfer. Columbus asserted that Yolanda Arnold was suspended for making false allegations against Lt. Daum. Specifically, she stated to PSU that both Sipe and Sawyers had witnessed Lt. Daum removing documents from FPB without authorization, but, when interviewed, Sipe and Sawyers denied this account and denied telling her that they had witnessed it. She was afforded a hearing, appealed to the CSC, and ultimately the suspension was reduced to forty hours (for failing to demonstrate sufficient diligence in giving PSU inaccurate information). As for her reassignment to Emergency Services, Columbus asserted that it was based in part on her false allegations against Daum. The transfer also coincided with the conclusion of the Krivda investigation and was based in part on the ongoing problems in FPB. Columbus thus articulated legitimate nondiscriminatory reasons for suspending and transferring Yolanda Arnold.

### C. Pretext

Because Columbus articulated legitimate, nondiscriminatory reasons for the adverse employment actions, the burden shifts back to Yolanda Arnold to "prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001).

---

individuals were not treated more favorably than she in circumstances that are sufficiently similar. Her allegations that Ellis was constantly AWOL and falsely documenting company time without repercussions, for example, are significantly different from her suspension for making false allegations.

A plaintiff may show pretext in three ways: "'(1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate the employer's action, or (3) that [the reason was] insufficient to motivate the employer's action.'" *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

Yolanda Arnold seems to argue that pretext is established by comments allegedly made by CDF employees before and during the investigations into FPB. Although he later denied making the comments, according to Krivda's interview notes, AC Ellis stated that "[Yolanda Arnold] thinks she's the civil rights leader and she's not." Capt. Jack Reall, Union President, and Janet Hedges, the FPB secretary, neither of whom were decisionmakers in the adverse actions taken against Yolanda Arnold, allegedly stated that she frequently plays the "race card."[7] Arnold also points to comments made by CDF employees in *Dispatch* articles and the negative media coverage in general.

In addition, Yolanda Arnold argues that pretext can be demonstrated by Columbus' continuous investigation of her and FPB over several years. "We have held that when an 'employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his

---

[7] Yolanda Arnold argues that two other comments demonstrate racial animus and pretext on the part of Columbus, but the district court correctly determined that those statements were inadmissible hearsay. First, Plaintiff Moore testified that Stacy Miller, a local business owner, told Moore that he heard AC Paxton state that "we need to get that nigger [Arnold] out of FPB." Even if this alleged statement by Paxton regarded his state of mind under Fed. R. Evid. 803(3), as Yolanda Arnold claims, the statement is hearsay within hearsay, and no exception applies to Miller, who passed on the statement to Moore. Second, Plaintiffs Fullen and Evergin testified that a City Councilwoman, Charlotta Tavares, told them that Safety Director Brown, who is African-American, told Tavares that he was "harder on blacks because he did not want it shown that he was showing any bias towards blacks." This statement is also hearsay within hearsay, and it is not admissible under Fed. R. Evid. 801(d)(2)(D) because Tavares's statement to Fullen and Evergin cannot be considered an admission by a party opponent.

true, longstanding motivations for [taking adverse action against] the employee,' the employer's actions constitute 'the very definition of pretext.'" *Hamilton*, 556 F.3d at 436 (quoting *Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007)). In *Hamilton*, we reversed the grant of summary judgment to the employer, finding sufficient evidence of pretext where the employer "increased its surveillance of [the employee's] work after he filed an age-discrimination complaint with the EEOC and then waited for an opportunity to fire him." *Id.* Yolanda Arnold argues that the "increased scrutiny" in the form of the three investigations is evidence that Columbus's otherwise legitimate reason for suspending and transferring her is pretext for discrimination. *See id.* at 435-36. One problem with this argument is that the PSU and CPD investigations of FPB began in 2004, before Yolanda Arnold sent a memo to Chief Pettus complaining of discrimination and before she filed her first OCRC charge in 2005. Moreover, the scope of the PSU and CPD investigations, as well as the subsequent Krivda investigation, was clearly broader than Yolanda Arnold. Further, Yolanda Arnold's allegations of discrimination prompted in part the Krivda investigation, the investigation clearly encompassed racial issues and allegations of discrimination within FPB, and Krivda's final report discussed Yolanda Arnold's allegations of discrimination at length.

In the light most favorable to Yolanda Arnold, the evidence is insufficient to establish pretext. She did not rebut Columbus' proffered reasons for suspending and transferring her, and presented insufficient evidence to show that those were not the real reasons behind Columbus' adverse employment actions. Yolanda Arnold was suspended for falsely accusing Daum and for lack of diligence. Assuming that her comparatives, Butcher and Paxton, were not disciplined for making false accusations against her regarding a promotional exam, Yolanda Arnold's accusations against Daum not only turned out to be false or at least unproven, but also involved more than Daum, as she

- 15 -

reported that two others had witnessed Daum removing documents from FPB without authorization, and those employees denied both having witnessed Daum's doing so and telling Yolanda Arnold that they had witnessed any such conduct by Daum. Moreover, Paxton's allegation against Yolanda Arnold was written in a letter to the Fire Chief, while she supposedly demonstrated a lack of diligence in failing to put her accusations or the statements of witnesses in writing. Finally, as to her removal and transfer out of FPB, the strongest evidence against pretext is that AC Paxton, who is Caucasian, was also removed from his position because of the numerous problems within FPB.

Yolanda Arnold has produced insufficient evidence that Columbus' proffered reasons for taking adverse actions against her were pretextual. Therefore, Columbus is entitled to summary judgment on her Title VII and OCRA discrimination claims.

## IV.

Columbus is also entitled to summary judgment on Plaintiffs' Title VII and OCRA hostile work environment claims. Title VII protects against an environment in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). Title VII and OCRA prohibit employees from being subjected to a hostile work environment based on their association with racial minorities. *Barrett*, 556 F.3d at 514-15; *Lysyj*, 313 N.E.2d at 4-6; *Cole*, 1996 WL 60970, at *1-2. *But see Smith*, 36 F. App'x at 830-31; *Berry*, 817 F. Supp. 2d at 1048-49.[8]

---

[8]We will assume that the district court correctly ruled that Maxwell and Moore could pursue their state hostile work environment claims on an association theory.

To establish a prima facie case of a hostile work environment based on race, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on plaintiff's protected status; (4) the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective or preventative actions. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007). In deciding whether actionable harassment exists, we must consider the totality of the circumstances, including the frequency of the alleged discriminatory conduct, its severity, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002).

Plaintiffs point to a number of incidents to support their claim. For example, certain CDF employees allegedly complained that Plaintiffs played the "race card" and Yolanda Arnold was allegedly subjected to fourteen "write-ups" for such things as seeking public records. Plaintiffs also point to the three separate investigations; the temporary loss of their remote parking privileges; the fact that the mostly African-American Inspections section of FPB was required to account for all 480 minutes of the work day; the unwelcome presence of the union at the Krivda investigation interviews; Krivda's tape-recording practices; Krivda's antagonistic attitude; *Dispatch* articles portraying African-American FPB officers and firefighters negatively, in part based on statements by CDF leadership and Columbus officials; orders against congregating or associating at work; and second-hand evidence of derogatory comments on the Union website and in phone calls to the CSC.

Although Moore claims his investigation for back-timing and an additional investigation amounted to a hostile work environment, Maxwell and Moore for the most part simply assert "that they suffered the same environment and consequences directed at them personally that all of the other similarly situated Black Appellants suffered."

Even if Plaintiffs could show that the alleged harassment was due to their protected status, they did not present evidence sufficient to satisfy the fourth prima facie element. "'[I]solated incidents . . . will not amount to discriminatory changes in the terms and conditions of employment'," unless "'extremely serious.'" *Williams v. CSX Transp. Co.*, 643 F.3d 503, 512 (6th Cir. 2011) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "'Conduct must be extreme to amount to a change in the terms and conditions of employment.'" *Hafford v. Seidner*, 183 F.3d 506, 514 (6th Cir. 1999) (quoting *Faragher*, 524 U.S. at 788). The incidents alleged by Plaintiffs took place over a number of years and Plaintiffs have not shown that they were "sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment." *Williams*, 643 F.3d at 512 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).[9]

## V.

Plaintiffs next claim that they were retaliated against for complaining of discrimination in violation of Title VII and the OCRA. To establish a prima facie case of retaliation, a plaintiff must

---

[9] Plaintiff Wesley Fullen points to additional instances of alleged harassment, which are discussed in the opinion in No. 11-3457. A plaintiff claiming hostile work environment must present evidence that he experienced, witnessed, or at least knew about the incidents of harassment that are to be used to support his claim. *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 719 (6th Cir. 2012). Because Plaintiffs in this case only discuss the incidents examined above, only those incidents are considered in evaluating their claim.

- 18 -

demonstrate that (1) he engaged in protected activity; (2) his employer knew about his exercise of protected rights; (3) the employer thereafter took adverse employment action against him or a supervisor subjected him to severe or pervasive retaliatory harassment; and (4) there was a causal connection between his protected activity and the adverse employment action or the retaliatory harassment. *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

Columbus concedes that Plaintiffs Yolanda Arnold, Eddie Arnold, Boyce, Cornett, Houston, Redmond, Rickman, and Taylor are able to meet the first two prima facie elements, i.e., they engaged in protected activity of which Columbus was aware.

### A. Retaliation by Adverse Action

Demonstrating the third prima facie element in a Title VII retaliation case, an adverse employment action is less onerous than in the discrimination context in that it "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks omitted). Under this standard, Plaintiffs have arguably demonstrated a number of adverse employment actions, including the investigations, loss of remote parking privileges, requirement to complete time sheets, and Yolanda Arnold's suspension and transfer.

Plaintiffs Eddie Arnold, Boyce, Houston, Redmond, Rickman and Taylor cannot establish a prima facie case because they failed to present sufficient evidence of a causal connection between their discrimination complaints and the adverse employment actions.

For the same reasons that we concluded in section III.c that Yolanda Arnold failed to show pretext in the race-discrimination context, she did not demonstrate that any allegedly retaliatory adverse employment actions were causally connected to her protected activity.

### B. Retaliatory Harassment[10]

Plaintiffs' retaliatory harassment claim fails for many of the same reasons discussed above. First, the incidents to which they refer were not severe or pervasive. Second and most importantly, even if the alleged harassment would have dissuaded a reasonable worker from making or supporting a charge of discrimination, Plaintiffs have not demonstrated a causal connection between any harassment and their protected activity. Columbus is therefore entitled to summary judgment on this claim as well.

### C. Maxwell and Moore

Maxwell and Moore argue that the district court erred when it ruled that they waived their retaliatory harassment claim. Assuming the district court erred, any error was harmless because Maxwell and Moore did not establish that the allegedly adverse employment actions were causally connected to their protected activity. Therefore, we affirm the district court.

## VI.

Plaintiffs' remaining claims are § 1983 claims that they were retaliated against in violation of the First Amendment and an equal protection claim. 42 U.S.C. § 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State

---

[10] Plaintiffs claim that the portion of their retaliation claim based on harassment was unchallenged by Columbus and should therefore be considered intact. Contrary to Plaintiffs' contention, Columbus did challenge this claim in its summary judgment brief.

or Territory." The district court correctly granted summary judgment to Columbus on both of these claims.

### A. First Amendment Retaliation

To support a First Amendment retaliation claim, a plaintiff must offer proof of three elements:

(1) the plaintiff was engaged in a constitutionally protected activity;

(2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and

(3) the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 585-86 (6th Cir. 2008) (internal quotation marks and citation omitted). Plaintiffs claim that they were retaliated against after engaging in free speech, i.e., discussing and complaining about alleged discrimination at CDF.

Most of the adverse actions complained of by Plaintiffs are foreclosed by *Monell.* Under § 1983, "a local government may not be sued . . . for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible . . . ." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A municipality can also be held liable for a "single decision" by a policymaker if "the official is the one who has 'the final authority to establish municipal policy with respect to the action ordered.'" *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1985)). Similarly, a municipality can be liable for a decision made by a subordinate if the decision was ratified by a final policymaker. *Id.* at 656. However,

"mere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification." *Id.* With regard to Plaintiffs' allegations that they were ordered not to congregate or discuss their complaints during work, that the *Dispatch* articles constituted a form of retaliation, and that Arnold was "written-up" by other officers, Plaintiffs have not shown that these actions were taken or ratified by a final policymaker. *See id.*

Maxwell and Moore assert that the Krivda investigation constituted improper First Amendment retaliation, but presented no evidence that the investigation was motivated in part by their exercise of constitutional rights.

There was evidence to support that two adverse actions against Yolanda Arnold were taken or ratified by Chief Pettus:[11] the suspension and her transfer from FPB to Emergency Services. She has not produced any evidence, however, that these actions were "motivated at least in part as a response to the exercise of [her] constitutional rights." *Jenkins*, 513 F.3d at 586. Rather, as explained above, Chief Pettus and Columbus had legitimate reasons for taking the adverse actions against her, which were not motivated by a discriminatory or retaliatory purpose. She fails to point to any evidence that suggests otherwise. Therefore, we affirm the district court's summary judgment determination as to Plaintiffs' § 1983 First Amendment retaliation claims.

### B. Equal Protection

Plaintiffs also contend that Columbus's selective enforcement of lawful policies violates their equal protection rights. A plaintiff seeking to establish such a violation must show that "'the

---

[11] It is debatable whether Chief Pettus should be considered a final policymaker because Safety Director Brown is the administrative head of CDF. For the sake of argument, however, we assume that Chief Pettus has "the final authority to establish municipal policy with respect to" Yolanda Arnold's suspension and transfer. *See Feliciano*, 988 F.2d at 655 (internal quotation marks omitted).

selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.'" *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1137 n.7 (6th Cir. 1995) (quoting *FSK Drug Corp. v. Perales*, 960 F.2d 6, 10 (2d Cir. 1992)). "The showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988).

"To show discriminatory purpose, a plaintiff can proffer 'evidence that an official chose to prosecute or engage in some other action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (quoting *King v. City of Eastpointe*, 86 F. App'x 790, 802 (6th Cir. 2003)). For the same reasons Plaintiffs did not demonstrate that Columbus's legitimate reasons for its allegedly adverse employment actions are pretext, here they have not shown a discriminatory purpose. With regard to Yolanda Arnold, Columbus had a legitimate reason to suspend her when she not only accused another officer of serious wrongdoing but also involved two employees who contradicted her account. Columbus removed her from FPB in response to the many problems in the division and also removed AC Paxton, a Caucasian officer in FPB. With regard to the remaining Plaintiffs, to the extent they can show "selective treatment," they have not shown that the treatment was actually "motivated by an intention to discriminate to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure [Plaintiffs]." *Wright*, 58 F.3d at 1137 n.7. Columbus is entitled to summary judgment on Plaintiffs' § 1983 Equal Protection claims.

**VII.**

Finally, the district court did not abuse its discretion by declining to assert supplemental jurisdiction over Plaintiffs' remaining state claims after dismissing all of their federal claims. *Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 892 (6th Cir. 1998); 28 U.S.C. § 1367(c)(3).

**AFFIRMED.**